IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **VeraSun Energy Corp.**, *et al.*, | Case No. 08-12606 (BLS) (Jointly Administered) |
| Debtors. | Related to Docket Nos: 2508, 2542, 2994, & 3035 |

# OPINION[1]

Before the Court are proofs of claim filed by four former high-level executives at VeraSun Energy Corp., the debtor in these chapter 11 cases. The executives claim to be owed money under "change in control agreements" that they signed in connection with a pre-bankruptcy merger. VeraSun objects to the executives' claims,[2] arguing that they exceed the cap that § 502(b)(7) of the Bankruptcy Code imposes on claims resulting from the termination of employment contracts.

The objection is sustained. The Court holds that the § 502(b)(7) cap applies to the executives' claims because the change in control agreements are part of the executives' employment contracts with VeraSun and the claims flow from the termination of those contracts. The executives' claims must therefore be disallowed to the extent they exceed the cap.

---

[1] The Court's jurisdiction over this matter is not in dispute. It exists under 28 U.S.C. §§ 157 and 1334. Venue is also proper here. 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

[2] The true objecting party is KDW Restructuring & Liquidation Services LLC, which is the entity empowered to administer VeraSun's plan of liquidation on a post-confirmation basis. But for simplicity's sake the Court uses "VeraSun."

# I. BACKGROUND[3]

In 2007, South Dakota-based VeraSun was a leading ethanol producer looking to increase its production capacity by acquiring a competitor. One potential target stood out: U.S. BioEnergy, another large ethanol producer based in the Midwest.

## A. *The Run-up to the Merger*

In mid-November 2007, VeraSun's board of directors met for an update on the merger talks between VeraSun and U.S. BioEnergy. Pleased with what they heard, the board directed VeraSun's management to keep working towards a deal. The board then turned to other matters, including a report from the committee on compensation, which had met earlier that day. The committee recommended that, in light of the potential merger, VeraSun should enter into change in control agreements ("CIC Agreements") with some of its senior managers. Under those agreements key managers would commit to stay at VeraSun and see the merger through in exchange for receiving compensation packages if they were later terminated. According to the committee, the CIC Agreements would "reinforce and encourage" management's "attention and dedication" to their jobs without the "distraction arising from the possibility of a change in control" at VeraSun. (Dickey Dec. Ex. 3 pp. 3, 5.) The board agreed and authorized the company to enter into the agreements.

Two weeks later, on November 28, 2007, VeraSun's board met again. The negotiations with U.S. BioEnergy had borne fruit; the

---

[3] For the most part, the background facts that follow are meant to provide context. The Court need not, and does not, make any findings of fact beyond those discussed in the "Legal Analysis" section. *See* Fed. R. Bankr. P. 7052 ("The court is not required to state findings or conclusions when ruling on a motion under Rule 12 or 56 or, unless these rules provide otherwise, on *any other motion*.") (emphasis added); *see e.g. Baker's Carpet Gallery, Inc. v. Mohawk Indus., Inc.*, 942 F.Supp. 1464, 1468 (N.D. Ga. 1996) (noting recital of facts in summary judgment opinion did "not represent actual findings of fact … [but was] presented simply to place the [c]ourt's legal analysis within the context of a specific case or controversy").

board had before it the proposed final terms of a merger. After reviewing the details, the board blessed the transaction, resolving unanimously to approve it. That same day, and "in connection with the merger," (Dickey Dec. Ex 1 p. 84), eight of VeraSun's senior executives signed CIC Agreements with the company. Among them were Donald Endres, VeraSun's Chief Executive Officer, Danny Herron, its Chief Financial Officer,[4] and William Honnef and Barry Schaps, both Senior Vice Presidents (together, the "Executives"). Each of these individuals worked at VeraSun under an at-will employment contract (the "Employment Contracts"; *see* Endres Dec. Exs. 1-5) that described his job responsibilities, salary, and benefits. And each had participated to some degree in the meetings that led to the board approving both the merger and the CIC Agreements.

### B. The Change in Control Agreements

The CIC Agreements themselves were virtually identical. They began by recognizing that "the possibility of a change in control" at VeraSun could create enough "uncertainty and questions" among management to cause managements' "departure or distraction," and thus harm the company. (CIC Agr. p. 1.[5]) To stave off that threat, the CIC Agreements provided the Executives with compensation packages—defined in the agreements as "Severance Benefits"—generous enough to "induce [them] to remain" at VeraSun until the merger with U.S. BioEnergy was either completed or called-off. (*Id.*) If the Executives were terminated without cause within two years of the merger closing, the benefits under the CIC Agreements came due.

Those benefits included a cash payment from VeraSun to the Executives equal to two times—or three times in the case of CEO Endres—their base salary and target annual bonus. That payment

---

[4] In addition to being CFO, Herron became President of VeraSun in January 2008.

[5] For an example of a CIC Agreement see Exhibit 1 to the Executives' Response. [Dkt. No. 2542.]

3

represented "severance pay and [was] in lieu of any further salary for periods subsequent to the Date of Termination." (*Id*. § 5(iii)(B).) The Executives were also guaranteed continued medical benefits and payment for unused vacation. Any unvested equity awards would vest, as would VeraSun's matching contributions under the company's 401(k) plan.

The CIC Agreements further guaranteed that once the merger occurred VeraSun could not change an Executive's position, duties, compensation, benefits, or work location, without entitling him to end his employment for "good reason" and to collect his compensation package. (*Id*. § 4.) Conversely, an Executive terminated "for cause" would forfeit his compensation package. (*Id.* §§ 4(iii), 5(ii).)

### C. *The Merger and VeraSun's Bankruptcy Filing*

On the morning of November 29, 2007, less then twenty-four hours after the Executives signed the CIC Agreements, VeraSun and U.S. BioEnergy executed the final merger documents. The companies then issued a press release announcing their intended union. That event qualified as a "Potential Change in Control" under the CIC Agreements, triggering the Executives' commitment not to leave the company. Six months later, a shareholder vote made the merger official, putting VeraSun on the fast-track to becoming the largest producer of corn-based ethanol in the world.

Unfortunately, by the fall of 2008 a worldwide economic crisis had set-in, severely contracting demand for VeraSun's ethanol. With its fuel fetching dramatically lower prices in the marketplace, VeraSun could not afford to buy corn at the prices it had previously agreed to pay. That Halloween, VeraSun filed a chapter 11 bankruptcy petition in this Court.

After ruling out a bankruptcy reorganization, VeraSun's representatives proposed, and the Court permitted, a series of sales to take place that disposed of substantially all of the company's assets. Leftover assets were to be liquidated and the proceeds distributed to VeraSun's creditors through its plan of liquidation.

As for the Executives, Herron and Schaps were terminated soon after the petition date. Endres and Honnef, stayed on at VeraSun until May 2009, when they too were let go. All four men filed timely proofs of claim in VeraSun's bankruptcy case[6] asserting that they are owed money under the CIC Agreements. Taken together the Executives' claims exceed $7.3 million. VeraSun timely objected to all four proofs of claim.

## II. THE PARTIES' ARGUMENTS

VeraSun does not dispute that its merger with U.S. BioEnergy qualifies as a "change in control" as that term is defined in the CIC Agreements. Nor does it take the position, for today at least, that the Executives should get nothing for their claims. Rather, VeraSun contends that the Executives are asking for more money than what the Bankruptcy Code allows them to recover. It posits that the CIC Agreements are employment contracts, and points out, correctly, that § 502(b)(7) of the Code caps claims resulting from the termination of employment contracts at one year's salary and fringe benefits (plus any earned but unpaid compensation). Because the Executives' claims exceed that amount, VeraSun reasons that they must be reduced and the surplus disallowed.

The Executives quarrel with that logic, especially the notion that the CIC Agreements are employment contracts. The CIC Agreements do not, according to the Executives, contain the usual marks of such a contract. For instance, "[t]hey do not address pay … define duties … [or] set forth a term of employment." (Exec. Resp. ¶ 13.) They are instead "stand-alone 'stay in place' agreements, designed to keep" key managers in place and working hard during an uncertain time at the company. (*Id.*) This the Executives say they did by remaining at VeraSun until the merger closed. They figure their claims "are for amounts already earned, … services already performed, … consideration al-

---

[6] The proofs of claim at issue are Claim No. 2976 (Herron), Claim No. 1915 (Endres), Claim No. 2680 (Honnef), and Claim No. 3219 (Schaps).

ready received," (*Id.* ¶ 23) and so do not "fall within the forward looking scope of § 502(b)(7)." (*Id.* ¶ 32.)

### III. LEGAL ANALYSIS

When, as here, a claim filed in a bankruptcy case is objected to, the Bankruptcy Code instructs courts to decide if the claim should be allowed against the bankruptcy estate, and if so, in what amount. 11 U.S.C. § 502(b). The vast majority of claims are allowed in the full amount permitted under nonbankruptcy law. *See In re S. Side House, LLC*, 451 B.R. 248, 260 (Bankr. E.D.N.Y. 2011). Others are capped at amounts set by the Bankruptcy Code itself, regardless of what nonbankruptcy law would permit.[7]

For instance, Bankruptcy Code § 502(b)(7) caps "claim[s] of an employee for damages[8] resulting from the termination of an employment contract." 11 U.S.C § 502(b)(7).[9] Those claims cannot exceed "the compensation[10] provided by [the employment] contract, without acce-

---

[7] While a "*claim* is for the total available under substantive nonbankruptcy law[,] … the *cap* … defines how much of the … claim will be allowed to be paid by the bankruptcy estate[.]" *Young v. Condor Sys., Inc. (In re Condor Sys., Inc.)*, 296 B.R. 5, 12 (B.A.P. 9th Cir. 2003) (emphasis in original, quotation marks omitted).

[8] "Damages," under § 502(b)(7) "span[] the full range of damages known to nonbankruptcy law that 'result' from 'termination of an employment contract.'" *Condor*, 296 B.R. 12.

[9] In pertinent part, § 502(b)(7) provides:

> If [an] objection to a claim is made, the court … shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim. except to the extent that—
> (7) if such claim is the claim of an employee for damages resulting from termination of an employment contract, such claim exceeds—
>   (A) the compensation provided by such contract, without acceleration, for one year following the earlier of—
>     (i) the date of the filing of the petition; or
>     (ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus
>   (B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates.

[10] "Compensation" under § 502(b)(7) encompasses more than mere wages, salaries, or commissions; it also extends to benefits. *In re Condor*, 296 B.R. 12; *see*

6

leration, for one year … [plus] any unpaid compensation due under [the] contract, without acceleration …." *Id*.

To decide whether the § 502(b)(7) cap applies to the Executives' claims here, the Court first considers whether the CIC Agreements are "employment contracts" under § 502(b)(7). If they are, the next question is whether the Executives' claims result from the termination of those contracts. For the reasons that follow, the Court finds that the answer to both questions is yes. The § 502(b)(7) cap therefore applies to the Executives' claims and they must be reduced accordingly.

### A. *The CIC Agreements and the Employment Contracts Form a Single Contract*

Section 502(b)(7) concerns claims resulting from the termination of an employment contract. Although the Bankruptcy Code does not define the term "employment contract," courts have defined it as a writing that "establishes the terms and conditions of an employment relationship." *In re FairPoint Commc'ns, Inc.*, 445 B.R. 271, 273 (Bankr. S.D.N.Y. 2011) (quoting *In re The Charter Co.*, 82 B.R. 144, 146 (Bankr. M.D. Fla. 1988)); *see also In re WorldCom, Inc.*, 361 B.R. 675, 682 (Bankr. S.D.N.Y. 2007) (providing non-exhaustive list of factors[11] to determine if an employment contract exists under § 502(b)(7), typically used where claimant professes to be an independent contractor). Here, the parties agree that the Executives had employment contracts with VeraSun (*i.e.*, the Employment Contracts). But they disagree over wheth-

---

*Anthony v. Interform Corp.*, 96 F.3d 692, 695 (3d Cir. 1996) (citing *In re Johnson*, 117 B.R. 461, 465 (Bankr. D. Minn. 1990)) (finding a terminated employee's claim for damages limited by § 502(b)(7) to "one year's pay plus benefits").

[11] Those factors include (a) how the agreement is titled, (b) if the agreement identifies job responsibilities, (c) if the agreement provides the terms for compensation and benefits, (d) if withholding taxes and social security benefits are deducted from pay, (e) if the agreement constrains the "employee" from certain other activities, (f) if the agreement is not assignable, (g) if the debtor had the right to control the activities of the "employee," and (h) the amount of hours the "employee" needed to devote to the debtor's business per year. *In re WorldCom, Inc.*, 361 B.R. at 682.

er the CIC Agreements are a part of those contracts. The Court finds that they are.

Employment contracts, like any contract, may be modified by later agreements through adding, subtracting, or altering terms. South Dakota law, which governs both the CIC Agreements and the Employment Contracts, recognizes this. S.D. Codified Laws § 53-8-7 (2011) ("a contract in writing may be altered by a[nother] contract in writing …."). And it is black letter law that a contract and any agreement modifying it may be considered together. As one treatise puts it, "When the same parties execute two instruments concerning the same subject matter, they may, under some circumstances, be regarded as one contract and construed together, whether made simultaneously or on different days." 11 R. Lord, *Williston on Contracts* § 30:4 (4th ed. 2011) (citing *Baltzer v. Raleigh & A.A.L.R. Co.*, 115 U.S. 634 (1885)); *see also Talley v. Talley*, 566 N.W.2d 846, 851 (S.D. 1997) (recognizing that "writings connected by internal references to each other and involving the same subject matter constitute a single contract for the entire transaction").

The circumstances of this case warrant considering the Employment Contracts and the CIC Agreements as one contract. The Executives and VeraSun were parties to both agreements. Though physically separate documents and signed at different times, they clearly relate to the same subject matter: the Executives' employment at VeraSun. Indeed, the point of the CIC Agreements was to "induce [the Executives] to remain in [VeraSun's] employ" and committed to their "assigned duties." (CIC Agr. p. 1.) But the CIC Agreements do more than passingly refer to a pre-existing employment relationship, they also set forth new terms and conditions that affect that relationship. For example, the Executives agreed they would not "leave the employ of the [c]ompany" and would to continue to serve as officers during the run-up to the merger. (*Id.* § 1(ii).) They also signed a "Confidentiality and Assignment Agreement," which was explicitly incorporated by reference into the CIC Agreements, and which included non-

8

compete and non-solicitation provisions. And they agreed to release any future claims against VeraSun for salary or benefits. In return, the Executives became eligible for a generous compensation package if they were terminated after a change in control. They also received certain guarantees that, even if they were not terminated, their current positions, duties, compensation, and work location would not change much. If they did change, the Executives could unilaterally terminate their employment for "good cause" and walk away with their full compensation packages. In at least these ways the CIC Agreements altered—not entirely, but significantly—the employee-employer relationship between the Executives and VeraSun.

Moreover, the CIC Agreements' key provisions and terms—the ones describing compensation—are ambiguous on their own; they need the Employment Contracts for context. For example, the Executives were promised a cash payment based on a multiple of their "annual base pay at the rate in effect" just before they received their termination notices. (CIC Agr. § 5(iii)(B).) But the CIC Agreements do not say what that rate is. The same thing goes for terms like "salary," "bonus," "benefits," and "assigned duties," which also appear undefined in key provisions of the CIC Agreements. Indeed, how would VeraSun know the amount to pay the Executives for "any vacation time earned but not taken," (*id.* § 5(iii)(C)), when the CIC Agreements are otherwise silent on the issue of how much vacation time the Executives "earned?" To figure out what those terms mean, to give them content, one must look elsewhere—to the Employment Contracts. The Executives themselves admit this:

> Job responsibilities are not defined or described [in the CIC Agreements]; they can only be determined by reference to actual employment contracts. The terms of compensation and benefits are also not defined or described. They, too, are created by other documents, and can only be determined by reference to those documents.

(Exec. Reply ¶ 45.)

9

The CIC Agreements also contain a "Related Agreements" section, which states that all "other agreements" between the Executives and VeraSun—Employment Contracts included—"shall remain in force." (CIC Agr. § 13.) If provisions conflict, the CIC Agreements trump the Employment Contracts "as if [the latter] had been formally amended to the extent necessary to" fix the conflict. (*Id.*)

For all these reasons, the Court finds that the CIC Agreements merely modify the Employment Contracts. Contracts are modified by "changes in one or more respects which introduce[] new elements into the details of the contract and cancel[] others but leave[] the general purpose and effect undisturbed." *Intn'l Bus. Lists, Inc. v. AT&T,* 147 F.3d 636, 641 (7th Cir. 1998) (applying Illinois law). Just so here. The CIC Agreements introduced a slew of "new elements" and provisions into the employment relationship between the Executives and VeraSun. Those provisions implicitly refer back to the Employment Contracts to fill-in key details that the CIC Agreements themselves omit. On top of that, the CIC Agreements acknowledge other agreements between the parties and provide for them to be reconciled with the CIC Agreements. Under these circumstances, the Court concludes that the CIC Agreements and the Employment Contracts should be read together as one contract.

The Executives say that no other court has found a stand-alone change in control agreement to be an employment contract. They highlight instead the First Circuit's opinion in *Mason v. Official Comm. of Unsecured Creditors (In re FBI Distribution Corp.)*, 330 F.3d 36, 41 (1st Cir. 2003), which notes that bankruptcy court below refused to apply the § 502(b)(7) cap to an executive's claim under a retention agreement because that agreement was separate from her employment contract. While the facts in *FBI* appear to align with the facts here, relying on that case has its problems. First, the bankruptcy court's decision against applying the cap to the retention agreement claim was not before the court on appeal, so the opinion has nothing of substance to say about it. *Id.* at 41 n.7; *see also Condor*, 296 B.R. at 19 (noting that the

issue was "present but not resolved" in *FBI*). Second, bankruptcy court decisions from other jurisdictions do not bind this Court.

Having found that the CIC Agreements are "employment contracts" as contemplated by § 502(b)(7), the Court next explains why the Executives' claims under those agreements are claims for "damages resulting from the termination" of that contract, such that the cap applies to them.

### B. *The Executives' Claims are for Unpaid Severance Benefits and so are Subject to the § 502(b)(7) Cap*

Courts considering the policy behind § 502(b)(7) have said that the section "was designed to limit the claims of key executives who had been able to negotiate contracts with very beneficial terms." *Protarga Inc. v. Webb (In re Protarga Inc.)*, 329 B.R. 451, 465 (Bankr. D. Del. 2005) (quoting *In re Cincinnati Cordage & Paper, Co.*, 271 B.R. 264, 269 (Bankr. S.D. Ohio 2001)); *accord In re CPT Corp.*, No. 4-90-5759, 1991 WL 255679, at *5 (Bankr. D. Minn. Nov. 26, 1991) ("[S]ection 502(b)(7) was intended to protect the estate from the burdensome claims of key executive employees who were able to exact high salaries and favorable terms in their employment contracts."). It should thus come as no surprise that senior executives' claims for severance pay, which is "money—apart from back wages or salary—paid by an employer to a dismissed employee," have been capped by § 502(b)(7). *Black's Law Dictionary* 1498 (9th ed. 2009) (defining "severance pay" and noting that severance "may be made in exchange for a release of any claims that the employee might have against the employer"). Unlike wages that are paid for services rendered, severance is meant "as compensation for the injury and losses resulting from the employer's decision to terminate the employment relationship." *Matson v. Alarcon*, 651 F.3d 404, 409 (4th Cir. 2011) (discussing severance pay under § 507 of the Bankruptcy Code); *see Harrington v. Dornier Aviation, Inc. (In re Dornier Aviation, Inc.*,) 305 B.R. 650, 654 (E.D. Va. 2004) (discussing policy behind cap and observing it "clearly limits an employee's claim for severance pay, as this is in effect a claim for prospective compensation

11

that is accelerated as a result of the termination."). Because both the amount of severance employees receive and "the triggering events allowing [them] to receive [it] lie within the employer's control," *Matson*, 651 F.3d at 409, senior executives are particularly well-positioned to provide themselves with generous severance packages. They therefore enjoy a distinct advantage over other unsecured creditors, including other employees, who cannot easily adjust their claims to the company's assets. Congress enacted § 502(b)(7) in part to limit the effect of that advantage if the company files for bankruptcy.

For example, in *Protarga* the debtor's CEO had a provision in his employment contract entitling him to "a severance benefit equal to 300% of the sum of his then current Base Salary; and his then-applicable Bonus Opportunity," plus more, if he was terminated after a change in control at the company. When that change came about, the CEO filed a proof of claim in the bankruptcy case for roughly $2.6 million in unpaid severance benefits. The court held that § 502(b)(7)'s cap applied and allowed only about $400,000 of the claim. *See also Cincinnati Cordage*, 271 B.R. at 269 (applying cap to employment contract providing executive with severance upon termination at three times his annual base salary); *accord CPT*, 1991 WL 255679, at *5 (applying cap to executive's severance payment); *Dornier Aviation*, 305 B.R. at 656 (same); *In re Uly–Pak, Inc.*, 128 B.R. 763, 769 (Bankr. S.D. Ill. 1991) (same).

Even though the CIC Agreements contain nearly identical language to that before the court in *Protarga*, the Executives protest that *Protarga* "present[s] a completely different situation" than this case. (Exec. Resp. ¶ 17.) The § 502(b)(7) cap should not apply to their claims, they say, because the cap is meant to limit claims for future compensation, not "claims for which the employer has received all the consideration for which it bargained." (*Id.* ¶ 31 (quoting *In re Lavelle Aircraft Co.*, Bankr. No. 94–17496DWS, 1996 WL 226852, at *5 (Bankr. E.D. Pa. May 2, 1996).) The Executives assert that because they stayed at VeraSun, worked hard, and saw the merger through, they lived up

12

to their end of the bargain. So they believe their claims are for "amounts already earned, … services already performed, … [and] consideration already provided." (*Id.* ¶ 23.) When they were terminated "all of the conditions for payment [had] occurred," making "100% of the compensation provided under the [Agreements] … due, without acceleration …." (*Id.* ¶ 34.) The Executives liken their claims to those of former employees for previously vested retirement benefits or deferred compensation owed to retirees, both instances where courts have found the § 502(b)(7) cap not to apply. *See e.g. Folsom v. Prospect Hill Res., Inc. (In re Prospect Hill Res., Inc.)*, 837 F.2d 453, 454-55 (11th Cir. 1988) (vested retirement benefits); *Lavelle Aircraft*, 1996 WL 226852 at *3-6 (deferred compensation owed to retirees). But for two reasons this line of argument is a dead end.

First, the CIC Agreements explicitly define what the Executives are getting as "Severance Benefits." (CIC Agr. § 5(iii).) But even beyond that label, the agreements contain provisions that, in this Court's experience, commonly appear in contracts for severance benefits. For instance, the benefits trigger upon the Executives' termination without cause or upon their leaving for good cause, the latter of which is not alleged here. And to get the benefits the Executives had to release all claims to any further salary or bonus from VeraSun.

Second, the CIC Agreements' key compensation provision states that the Executives receive this "severance pay … *in lieu of any further salary for periods subsequent to the Date of Termination*." (*Id.* § 5(iii)(B) (emphasis added).) Such "prospective compensation" paid on termination is not compensation for services already rendered. *Dornier Aviation*, 305 B.R. at 654-55.

For example, in *In re Netbank, Inc.*, No. 3:07–bk–04295, 2010 WL 5296952 (Bankr. M.D. Fla. March 11, 2010), a chief restructuring officer's employment contract with the debtor provided for a large "termination payment" if he was let go before his term of employment ended. When he was let go, he filed a claim for that payment. He argued that the cap should not apply because "the termination payment

[was] not future compensation which would have been earned if he had not been terminated." *Id*. at *7. Rather, he claimed it was "simply unpaid compensation due under the Employment Agreement." *Id*. The court disagreed and applied the cap.

While this Court appreciates the economic impact today's ruling will have on the Executives, it cannot ignore the plain language of the CIC Agreements and pretend that the "Severance Benefits" are really something else. Nor does the Court find a good reason to depart from the long line of cases applying the § 502(b)(7) cap to such payments. Accordingly, the Court concludes that the cap applies to the Executives' claims.

## IV. CONCLUSION

For all of these reasons, the Court concludes that the Executives' claims must be capped under § 502(b)(7) of the Bankruptcy Code. The Court cannot, and will not, allow those claims to exceed what the Code provides for in that section.

With today's ruling as the backdrop, the Court directs the parties to confer within the next 30 days and agree on the amount of each Executive's claim to be allowed. If the parties cannot agree, the Court will conduct such further proceedings as may be necessary to fix these allowed claims with precision.

                              **BY THE COURT**:

Dated: March 26, 2012
Wilmington, Delaware

Brendan Linehan Shannon
United States Bankruptcy Judge